Todd Blanche
Deputy Attorney General of the United States
S. Peter Serrano
First Assistant United States Attorney
Eastern District of Washington
Alison Gregoire
Criminal Chief
Jeremy J. Kelley
Tyler H. L. Tornabene
Assistant United States Attorneys
Echo D. Fatsis
Contract Law Clerk
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Dec 11, 2025

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GABRIELLE DIONYES LAUREN BERNARD,<br><br>Defendant. | Case No.: 2:25-cr-188-TOR<br><br>INFORMATION<br><br>Vio: 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b)<br>Conspiracy to Violate the Anti-Kickback Act<br><br>18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c)<br>Forfeiture Allegations |

The United States charges:

General Allegations

*Medicare and Coverage for Diagnostic Laboratory Testing*

1. Medicare is a federal health care benefit program that provides health insurance to elderly and disabled citizens in the United States. Medicare provides

INFORMATION                                    1

health insurance coverage for eligible health care services including hospital services, outpatient services, medical equipment, prescription drug costs, and certain types of diagnostic laboratory testing.

2. Medicare covers diagnostic laboratory testing only if such test is reasonable and necessary for the diagnosis or treatment of illness or injury. In order to be considered reasonable and medically necessary, clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are considered not reasonable and necessary and therefore not reimbursable under Medicare.

3. The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), makes it unlawful to knowingly and willfully solicit or receive any remuneration, directly or indirectly, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, such as Medicare.

4. Defendant, GABRIELLE DIONYES LAUREN BERNARD ("Defendant"), is a licensed physician in Washington State.

5. Between on or about July 22, 2021, and continuing thereafter until on or about March 15, 2022, in the Eastern District of Washington and elsewhere, Defendant knowingly and willfully conspired and agreed with other persons both known and unknown, to violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), by knowingly and willfully soliciting and receiving remuneration in return for referring individuals to persons for the furnishing or arranging for the furnishing of items and services for which payment was in whole or in part under a Federal health care program, to wit, the Medicare program.

MANNER AND MEANS OF THE KICKBACK SCHEME AND CONSPIRACY

INFORMATION — 2

6. It was part of the conspiracy that on or about July 22, 2021, Defendant executed a "Provider Network Agreement" with a company, referred to hereinafter as Company A, to provide contracted physician telemedicine services in support of certain types of genetic laboratory testing. Company A in turn arranged with a telemedicine company known as Company B to provide contracted physician services, including Defendant's services, in support of Company B's attempts to market genetic testing and other types of telemedicine services. Company A provided a list of criteria to Defendant for determining whether an individual qualified for genetic testing.

7. As a further part of the scheme and conspiracy, Company B arranged with various telemarketing companies to contact by telephone elderly Medicare beneficiaries. The Medicare beneficiaries were told by the telemarketing company representatives that they qualified for cardiovascular, pharmacogenetic, or cancer genetic testing, which would provide valuable information about the beneficiaries' health by determining whether they were at genetic risk for cardiovascular disease, negative drug interactions, or cancer. Beneficiaries were further informed by telemarketing representatives and Defendant that Medicare would cover the entire cost of the testing, such that there would be no out-of-pocket cost to them. The telemarketing companies took information from beneficiaries regarding their personal and family history with heart conditions including high blood pressure and high cholesterol, or cancer, and current medications.

8. As a further part of the conspiracy, once the telemarketing companies had obtained this family and personal information from beneficiaries, Company B informed the beneficiaries that they would need to speak briefly to a physician, promised the beneficiaries it would only take one to three minutes, and then connected beneficiaries by phone with either Defendant or a different available physician through a web-based application.

INFORMATION                                    3

9. As a further part of the conspiracy, during a brief telephone conversation that typically took between approximately one and four minutes, Defendant would confirm a beneficiary's personal and family history with autoimmune conditions, neurocognitive conditions, or cancer. Defendant started most calls by telling the beneficiary the call would take less than two minutes. In some calls, Defendant did not ask a beneficiary any questions about their medical history. Defendant, using criteria provided by Company A, approved genetic testing for nearly every beneficiary with whom she spoke. Other than applying the criteria provided by Company A against the patient's self-reported history provided to Company A and sometimes confirmed by Defendant with the beneficiary, Defendant did not exercise any independent medical judgment regarding whether the beneficiary needed or could benefit from genetic testing. Defendant did not review any medical records or documentation other than the beneficiary's self-reported family history and self-reported medication list as taken by the telemarketing company. Defendant did not take any vital signs of any beneficiaries, nor did Defendant observe, remotely or otherwise, the beneficiary or establish a bona fide physician-patient relationship. Defendant's discussion with the beneficiary was limited to applying Company A's criteria for determining whether a beneficiary was qualified for the immunodeficiency, neurocognitive, or cancer genetic testing and did not include any other medical information or discussion of the beneficiary's health condition or any health problems or concerns.

10. As a further part of the conspiracy, in order to convince some beneficiaries to agree to the test, and consistent with direction provided by Company A, Defendant occasionally advised beneficiaries that the genetic testing results could be helpful for the beneficiaries' children or grandchildren, and the tests were a benefit of Medicare.

INFORMATION                                    4

11. As a further part of the conspiracy, Defendant occasionally asked the beneficiaries whether they would agree to the test. Oftentimes, relying on the information provided by Company A, Defendant simply stated the beneficiary was interested in a specific genetic test and did not ask the beneficiary to confirm their interest. If beneficiaries agreed to the test or otherwise continued with the call without objection, Defendant electronically approved it in the electronic health record system.

12. As Defendant knew, and as a further part of the conspiracy, Defendant's electronic signature was electronically applied to separately generated documentation that falsely stated that the test was medically necessary under Medicare guidelines and that it would be used to make decisions regarding the patient's care. Defendant's electronic signature was affixed to progress notes, for Company B, that purported to document visits with the signing physician in which the physician purportedly consulted with the beneficiaries about their current symptoms and conditions and determined that genetic testing was medically indicated.

13. As Defendant also knew, and as further part of the conspiracy, Defendant's electronic signature was electronically applied to separately generated requisition forms for various genetic testing laboratories that contained a certificate of medical necessity. While the wording of these certifications varied slightly, Defendant's electronic signature, as she knew, was applied to statements indicating that she had obtained informed consent from the beneficiaries, and the test results would be used by her during the medical management and treatment of the beneficiary.

14. The purpose of these false certifications was to make it appear as though the testing was appropriately ordered and eligible for Medicare reimbursement. As a further part of the conspiracy, once the documentation had

INFORMATION 5

been assigned Defendant's signature, beneficiaries received a test kit in the mail from a genetic testing laboratory, which they would use to perform a buccal swab (i.e., a cheek swab using a cotton swab) and then mail the DNA sample back to the testing laboratory.

15. As a further part of the conspiracy, after the genetic testing laboratory received the sample, the laboratory billed Medicare sometimes as much as thousands of dollars for each test and identified Defendant as the "referring physician" who had ordered the test.

16. Defendant knowingly participated in this scheme and conspiracy with respect to hundreds of beneficiaries residing and located in the Eastern District of Washington, and in other states in which Defendant was licensed to practice medicine.

17. None of the genetic testing ordered by Defendant was medically necessary or reimbursable under Medicare, because, among other things: Defendant was not treating any of the beneficiaries for any medical issues; Defendant did not have or establish a bona fide physician-patient relationship with any of the beneficiaries with whom she spoke; Defendant never used any of the results of the testing in the treatment of any beneficiaries; Defendant did not make a meaningful or reasonable diagnosis of medical necessity for any of the patients using independent medical judgment; and Defendant was being paid a kickback for each genetic test she approved.

18. As a further part of the conspiracy, in return for her participation in the scheme described above, Defendant received approximately $20 for each beneficiary phone conversation, which typically took between one and four minutes of Defendant's time.

19. Billing data from Medicare indicates that during the relevant time period, through Defendant's participation in the scheme, more than 7,800 claims

INFORMATION                                6

on behalf of at least 850 Medicare beneficiaries for genetic tests were falsely and fraudulently billed to Medicare based upon Defendant's approvals as the ordering physician, resulting in payment of approximately $5,450,000.00 in improperly and fraudulently obtained Medicare funds.

20. The majority of these payments were shared only between Defendant's co-conspirators. However, between July 22, 2021, and March 15, 2022, Defendant received at least $91,350.00 as her personal compensation for her participation in the scheme. These payments were kickbacks in violation of 42 U.S.C. § 1320a-7b(b) in that Defendant received them in return for her ordering and referring medically unnecessary genetic testing.

## OVERT ACTS

21. The allegations set forth above in paragraphs 1 through 20 are realleged and incorporated herein.

22. In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Washington, and elsewhere:

(a) On or about July 22, 2021, Defendant executed a "Provider Network Agreement" with a company, referred to as Company A, to provide contracted physician telemedicine services in support of certain types of genetic laboratory testing. As part of the contract, Defendant was to be paid per consultation.

(b) As further set forth above, Defendant referred and ordered medically unnecessary genetic testing to be billed to Medicare for thousands of beneficiaries, including dozens of beneficiaries residing in the Eastern District of Washington. For each of these beneficiaries, Defendant solicited and received a kickback in the form of monetary remuneration in return for ordering the test or other service. Defendant's conduct resulted in Medicare being billed for and paying approximately $5,450,000.00 for medically unnecessary genetic testing and other

INFORMATION                              7

items and services ordered and referred by Defendant between July 22, 2021, and March 15, 2022. Defendant received approximately $91,350.00 in kickbacks as her personal compensation for her participation in the scheme and conspiracy. All in violation of 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b).

## NOTICE OF FORFEITURE ALLEGATIONS

The allegations contained in this Information are hereby re-alleged and incorporated herein by this reference for the purpose of alleging forfeitures.

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of Conspiracy to Violate the Anti-Kickback Statute, in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b), as alleged in this Information, Defendant GABRIELLE DIONYES LAUREN BERNARD, shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to, the following:

### MONEY JUDGMENT

A sum of money equal to $91,350.00 in United States currency, representing the amount of proceeds obtained by the Defendant as a result of her illegal conduct.

If any of the property described above, as the result of any act or omission of Defendant:

(a) cannot be located upon the exercise of due diligence;
(b) has been transferred or sold to, or deposited with, a third party;
(c) has been placed beyond the jurisdiction of the court;
(d) has been substantially diminished in value; or
(e) has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to

INFORMATION                                    8

1  21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. §
2  2461(c).

4      Dated this 11th day of December 2025.

Todd Blanche
Deputy Attorney General

*/s/ Alison L. Gregoire*
Alison L. Gregoire
Criminal Chief

*/s/ Jeremy J. Kelley*
Jeremy J. Kelley
Assistant United States Attorney

*/s/ Tyler H. L. Tornabene*
Tyler H. L. Tornabene
Assistant United States Attorney

*/s/ Echo D. Fatsis*
Echo D. Fatsis
Contract Law Clerk

28 | INFORMATION          9